# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================

## ON MOTION FOR REHEARING

========================

NO. 03-04-00017-CR
NO. 03-04-00046-CR
NO. 03-04-00047-CR
NO. 03-04-00048-CR

**Terry Ulloa, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT
NOS. CR2002-376, CR2003-250, CR2003-251 & CR2003-252,
HONORABLE GARY L. STEEL, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Our opinion and judgments issued August 10, 2005, are withdrawn, and the following

opinion is substituted.

Appellant Terry Ulloa was indicted for several instances of drug possession and

delivery occurring on or about June 21, July 6, July 13, and December 15, 2000.[1]  The jury found

---

[1] Appellant was also convicted of bail jumping and failure to appear in CR2002-376 (our cause number 03-04-00017-CR) and sentenced to ten years' imprisonment, but he does not challenge that conviction on appeal.

appellant guilty of possession and delivery of marihuana in a drug-free zone on July 13, delivery of marihuana in a drug-free zone on July 6, possession of cocaine and methamphetamine in a drug-free zone on July 13, and possession of marihuana on December 15. The jury found him not guilty of delivery of marihuana on June 21. He was sentenced to two years' imprisonment for each count of possession of marihuana, ten years for each delivery count, and fifty years each for the cocaine and methamphetamine counts. He contends that the evidence is legally insufficient to support: (1) the conviction for delivery of marihuana on July 6 and July 13; (2) the conviction for possession of marihuana on December 15; and (3) the jury's findings of a drug-free zone related to the July 6 and July 13 charges. As discussed below, we reverse the conviction for marihuana possession on December 15, 2000. We affirm the remaining convictions.

## Standard of Review

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and ask whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); *Howard v. State*, 972 S.W.2d 121, 124 (Tex. App.—Austin 1998, no pet.). The State may prove the elements of an offense by circumstantial evidence. *Barnes v. State*, 62 S.W.3d 288, 297 (Tex. App.—Austin 2001, pet. ref'd). We determine the sufficiency of the evidence based on the cumulative effect of all of the evidence. *Id*. The jury may accept or reject all or any of the evidence presented, may draw reasonable inferences from the evidence, and must reconcile any evidentiary conflicts. *Id*. at 298.

2

**Delivery of Marihuana on July 6 and July 13**

Appellant argues that the evidence is legally insufficient to support the convictions for delivery of marihuana on July 6 and 13.[2]  He asserts that because no one saw him deliver the drugs on July 6, there is no evidence that would allow the jury to find it was he who made the delivery.  He further contends that neither delivery was made directly to the undercover officer, but instead through a third party, and because he was not a party to the subsequent transfer to the officer, the evidence is legally insufficient to support the convictions.

*Factual Summary*

In 2000, Pete Arroyo, an undercover narcotics officer with the Comal County Sheriff's Office, began buying small quantities of drugs from Robert Ortiz.  On June 15, Ortiz was out of marihuana and asked Arroyo to drive him to the west side of New Braunfels to buy more.  Ortiz said that Arroyo should drop him off before the actual destination because Arroyo "couldn't go near the house where he was buying" because "Terry" was paranoid and did not want anyone parking in front of his house.  Arroyo dropped Ortiz off, and Ortiz walked up a street called Pecan Corner, returning empty-handed because Terry was not home.  When they came back later to see if Terry had returned, Ortiz pointed to 2870 Pecan Corner and said, "That's Terry's house."

---

[2] Cause CR2003-251 contains guilty verdicts in count III and count IV; count III is for marihuana delivery on July 6 and count IV is for delivery on July 13.  In his summary of his points of error, appellant states, "The Evidence is Legally Insufficient to Support the Conviction as to Count III in Case Number CR2003-251," but he attacks the evidence supporting count III and count IV. We will examine the sufficiency of the evidence to support both counts.

3

On June 16, Arroyo asked if he could get a pound of marihuana.[3] Ortiz said he could, and on June 21, Arroyo returned with $500 supplied by the Department of Public Safety. Arroyo drove Ortiz back to the area near Pecan Corner and gave Ortiz the money. Arroyo watched Ortiz walk to and from the driveway at 2870 Pecan Corner, losing sight of him for about eleven minutes. Ortiz returned with a bag of marihuana and said that the person he got the drugs from was upset because Arroyo had parked too close. On July 6, Arroyo again went to buy a pound of marihuana. He drove Ortiz to the west side of town and dropped him off on a street near Pecan Corner. Ortiz was gone for about ten or fifteen minutes and returned with a bag of marihuana. Adam Pastrano of the Comal County Sheriff's Office was performing surveillance, and he rode by on a bicycle and stopped at a nearby house, all the while observing Ortiz's activities at 2870 Pecan Corner. Pastrano had been shown a photograph of appellant and given his description as "a slender-built Hispanic male," and Pastrano saw Ortiz with a short-haired man matching the description. At trial, Pastrano could not be sure that appellant was the man he saw, but he said appellant "has the same appearance." Pastrano said, "I couldn't see a face, but the features were there." Pastrano testified that as of July 13, appellant had short hair, while his brother, Tony Ulloa, had hair almost to his shoulders.

On July 13, Arroyo again dropped Ortiz off near Pecan Corner, and Ortiz returned with a bag of marihuana. Two surveillance officers posing as a surveying crew saw Ortiz approach 2870 Pecan Corner, speak to someone inside, and then step into the yard to wait. Appellant came

---

[3] Appellant was originally charged with delivery of marihuana on June 16 as well, but that charge was not submitted to the jury.

4

out of the house and gave Ortiz a bag in exchange for something. Later that night, the police executed a search warrant of the house and found in the back bedroom several bags of marihuana and a glass jar containing several small plastic bags of white and brownish substances, which were determined to contain cocaine and methamphetamine. In the same room, officers also found more than $2,000, including money Arroyo used to buy the marihuana earlier that day, and a wallet containing appellant's driver's license and social security card. In the bedroom closet, they found ownership papers for several vehicles, all listing appellant's address as 2870 Pecan Corner. Appellant and his brother, Tony Ulloa, were in the living room when the police arrived.

After the search, appellant and Tony Ulloa contended that it was Tony, not appellant, who owned and dealt the drugs. Tony Ulloa testified at trial that the drugs were his and that it was he who delivered drugs directly to Ortiz. He also said that he lived in the house and used the back bedroom exclusively and that appellant did not live in the house. However, the police never determined that Tony Ulloa lived in the house, while records led them to believe appellant did live there, and several officers testified that Tony Ulloa seemed uncertain about or was unable to describe what drugs were found or how they were packaged. Further, Fauna Rowlette-Ulloa, appellant's wife, testified that starting in February 2000, she frequently stayed at the house with appellant.[4] She testified that at times she, her son E.R., appellant, appellant's mother, and Tony Ulloa all had lived

---

[4] Rowlette-Ulloa did not want to testify against appellant. She asserted that she was appellant's common-law wife, testifying that she and appellant dated and lived together on and off, starting in about February 2000, and throughout their relationship referred to each other as husband and wife. After a hearing, the trial court determined that appellant and Rowlette-Ulloa were married two days before Thanksgiving in 2000. Up until that point, including June and July 2000, they were dating and beginning to live together. The trial court ruled that Rowlette-Ulloa and appellant could not claim the spousal privilege as to events occurring before late November 2000.

5

in the house. She, E.R., and appellant used the back bedroom, appellant's mother used the other bedroom, and she did not know where Tony stayed. Rowlette-Ulloa moved out of appellant's house at the end of June 2000 and did not return until sometime after July 15, 2000. She did not know what the sleeping arrangements were while she was away.

Appellant concedes that the surveillance team saw him deliver the drugs to Ortiz on July 13. However, because Pastrano did not see the face of the person handing the drugs to Ortiz on July 6, he argues the evidence is legally insufficient to show it was he who made the delivery on that date. We disagree.

Viewed in the light most favorable to the verdict, the evidence shows that appellant lived in the house at 2870 Pecan Corner, specifically in the back bedroom where the police found the drugs and large sums of money, including money used by Arroyo to purchase drugs on July 13. Ortiz told the police that "Terry" was his source for the marihuana bought by Arroyo. Pastrano saw Ortiz meet with a short-haired, slim-built Hispanic man. Appellant's defensive argument was that it was his brother Tony, not appellant, who was making the drug deliveries to Ortiz. However, Tony Ulloa had long hair in July 2000, and the police watched appellant make a very similar delivery on July 13. The jury was entitled to listen to the evidence and draw reasonable inferences therefrom. *See Barnes*, 62 S.W.3d at 298. A reasonable jury could infer that it was appellant who delivered the drugs to Ortiz on July 6.

Appellant next argues that because the evidence shows he gave the drugs to Ortiz, not to Arroyo, the evidence is legally insufficient to show that he made an actual transfer to Arroyo. A person commits the offense of delivery of marihuana when he knowingly or intentionally delivers

6

marihuana. Tex. Health & Safety Code Ann. § 481.120(a) (West 2003). The indictments alleged that appellant "did then and there intentionally or knowingly deliver, by actual transfer, to Pete Arroyo" less than five pounds of marihuana. *See generally Sims v. State*, 117 S.W.3d 267 (Tex. Crim. App. 2003) (discussing and distinguishing constructive and actual transfers).[5] The charge instructed the jury that "deliver" meant the "actual transfer from one person to another" and that appellant could be convicted under the law of parties if the offense was committed by someone appellant solicited, encouraged, directed, or aided in the commission of the offense. *See* Tex. Health & Safety Code Ann. §§ 481.002(8) (West Supp. 2004-05) (defining "deliver"), .120 (delivery of marihuana); Tex. Pen. Code Ann. § 7.02 (West 2003) (law of parties).

The jury could have found that Ortiz acted either as Arroyo's agent or as appellant's "steerer," someone who solicits business for a drug dealer. *See Marable v. State*, 85 S.W.3d 287, 291 & n.11 (Tex. Crim. App. 2002) (Cochran, J., concurring). In June, when Ortiz first had Arroyo drive him to appellant's house, he told Arroyo that "Terry" was upset because Arroyo had parked too close to the house during the transaction. When Arroyo asked Ortiz if he could get a pound of marihuana, Ortiz contacted appellant and acted as the go-between for the later sales. The jury could reasonably have concluded that Ortiz was an agent of Arroyo or represented and was identified with Arroyo. *See Heberling v. State*, 834 S.W.2d 350, 353-54 (Tex. Crim. App. 1992). Alternatively,

---

[5] Actual transfer is defined as "the manual transfer of property from the transferor to the transferee *or to the transferee's agents or to someone identified in law with the transferee*." *Heberling v. State*, 834 S.W.2d 350, 354 (Tex. Crim. App. 1992). Constructive transfer is "the transfer of a controlled substance either belonging to the defendant or under his direct or indirect control, by some other person or manner at the instance or direction of the defendant." *Davila v. State*, 664 S.W.2d 722, 724 (Tex. Crim. App. 1984).

the jury could have found that appellant assisted in Ortiz's delivery of the marihuana to Arroyo and convicted him as a party. *See Marable*, 85 S.W.3d at 291 (Cochran, J., concurring). Whether appellant knew Arroyo in particular was the intended recipient is of no importance. *See Heberling*, 834 S.W.2d at 353-54. We hold that the evidence is legally sufficient to support the convictions for delivery of marihuana on July 6 and July 13 and overrule appellant's first issue.

### December 15 Possession Charge

In his second point of error, appellant argues that the evidence is insufficient to show that he possessed marihuana on or about December 15. We agree.

The State introduced into evidence a videotape given to them in August 2002 by Rowlette-Ulloa. The tape is labeled, "[E.R.] at Terry's, X-Mas 2000." On the tape, appellant is seen standing next to the stove in the kitchen. He makes some joking gestures and talks to Rowlette-Ulloa as she makes the tape.[6] Behind him, several clear plastic bags are visible under a chair. The bags appear to contain something, but the color or texture of the contents is not clear. Rowlette-Ulloa asks what the bags are, and appellant answers, "It's two sisters, Mary and Jane," who are going to make appellant some money. Sergeant Rogelio Garza testified that he believed the bags contained marihuana. On cross-examination, Garza said that he did not know the bags contained marihuana and that the bags were never seized or tested by the police to determine their contents.

---

[6] Rowlette-Ulloa gave the video to the police in August 2002, when she was in a women's shelter. Although appellant argued at trial that the tape should be protected by marital privilege, the trial court ruled that Rowlette-Ulloa waived any privilege by voluntarily giving it to the police.

The State argues that because Garza thought the bags contained marihuana and because "Mary Jane" is slang for marihuana, the evidence is legally sufficient to support the conviction. We disagree. In *Deshong v. State*, one of the cases cited by the State, the police officer's testimony that he found a bag containing what he believed to be marihuana was sufficient to prove that the substance was in fact marihuana. 625 S.W.2d 327, 329-30 (Tex. Crim. App. 1981). However, in that case, the officer actually saw the contraband in person, and the defendant did not challenge the officer's ability to recognize marihuana. *Id*. at 330. In *Hernandez v. State*, the court held that a defendant's statement to a police officer that a substance was heroin was sufficient to prove that the defendant possessed heroin. 698 S.W.2d 679, 680 (Tex. Crim. App. 1985). In that case, the officer saw the defendant holding a needle and a packet of tin foil and asked what it was, and the defendant said it was "stuff." *Id*. The defendant argued that "stuff" did not sufficiently prove that the substance was heroin, but the court noted that the police officer also testified without objection that the defendant told him the substance was heroin. *Id*. The court held that because the defendant did not object to or challenge that testimony, the defendant's statement of fact was sufficient to support the verdict. *Id*. at 679-80.

Here, Garza gave his opinion about what he believed the bags contained, based only on his viewing of the videotape. He did not see the substance in person and could not say with certainty that it was marihuana. Appellant challenged Garza on cross-examination, resulting in Garza's admission that the substance was never seized or tested.

Neither party points us to case law directly on point. Appellant states that he conducted an exhaustive search and did not find any cases in which a defendant was convicted of

9

drug possession when the substance had never been in the State's custody at some point. The State notes that appellant has not pointed to authority requiring the State to have actually possessed a substance to prove its identity. We have found several cases in which a defendant was convicted without the drugs having been tested in a laboratory, but those cases generally involved a police officer's testimony that he or she actually viewed, felt, or smelled the substance in question and believed the substance to be contraband. *See*, *e.g.*, *Deshong*, 625 S.W.2d at 329-30 (officer discovered and observed contraband himself); *Osbourn v. State*, 59 S.W.3d 809, 812, 817 (Tex. App.—Austin 2001), *aff'd*, 92 S.W.3d 531 (Tex. Crim. App. 2002) (officer was trained to recognize marihuana and testified that substance had appearance and odor of marihuana); *Venegas v. State*, 877 S.W.2d 542, 544 (Tex. App.—Beaumont 1994, no pet.) (officer testified that substance smelled, looked, and felt like marihuana); *see also Roberts v. State*, 9 S.W.3d 460, 462-64 (Tex. App.—Austin 1999, no pet.) (defendant convicted of delivering drugs to a minor based on minors' testimony that defendant gave them marihuana, which they had used before and knew its effect and recognized its odor, and discovery of small amounts of marihuana in places consistent with minors' descriptions of where drugs were used and hidden). We have found one case in which a juvenile defendant was adjudicated delinquent for a drug offense when the drugs were never seized by the police. *See In re L.G.*, 728 S.W.2d 939, 943 (Tex. App.—Austin 1987, writ ref'd n.r.e.). In that case, L.G. and two other juveniles were videotaped "engaging in conduct consistent with the ingestion of cocaine," but the powdery substance was consumed and not recovered by the police.

*Id.* at 941. We held that the testimony of one of the other juveniles that L.G. told her the substance was cocaine was direct evidence that L.G. possessed cocaine.[7] *Id.* at 942-43.

In this case, Garza viewed a videotape, which shows plastic bags under a table across a room and from that, formed an opinion that the substance in the bags was marihuana. Garza did not see the drugs in person and had no sensory information about the substance shown in the videotape. *See Deshong*, 625 S.W.2d at 329-30; *Osbourn*, 59 S.W.3d at 812; *Venegas*, 877 S.W.2d at 544. The videotape does not show appellant or anyone else using the substance contained in the

---

[7] In a similar case, a defendant was convicted of drug possession based on a videotape taken by the police from Conde and King, two people caught with cocaine and drug paraphernalia and arrested for drug possession. *Kephart v. State*, 888 S.W.2d 825, 827 (Tex. App.—San Antonio 1993), *rev'd on other grounds*, 875 S.W.2d 319 (Tex. Crim. App. 1994) (holding that videotape should not have been admitted into evidence). *But see Angleton v. State*, 971 S.W.2d 65, 68-69 (Tex. Crim. App. 1998) (holding that rule of evidence 901 should be used to determine admissibility of videotape evidence, rather than test used in *Kephart*). King testified that she and Conde went to Kephart's house, that Conde had a clear plastic bag of cocaine with him, that Kephart inhaled cocaine, that King made crack cocaine on Kephart's stove, and that Kephart smoked some of the crack cocaine. *Kephart*, 888 S.W.2d at 828. The videotape showed Kephart sitting next to Conde as he held a clear plastic bag containing a white powder and also showed some of the seized drug paraphernalia. *Id.* at 829. In a statement to the police, Kephart said that other people had snorted cocaine. *Id.* at 829. The court held that the videotape and the paraphernalia *corroborated King's accomplice testimony* that appellant had used and possessed cocaine. *Id.*

*See also Hall v. State*, No. 01-00-00910-CR, 2001 Tex. App. LEXIS 7804, at *13-15 (Tex. App.—Houston [1st Dist.] Nov. 21, 2001, no pet.) (not designated for publication). In *Hall*, the defendant was convicted of engaging in criminal activity, including the overt act of delivering crack cocaine. *Id.* at *5. The delivery was shown through a videotape on which Hall "demonstrated how to sell crack cocaine to customers." *Id.* at *9. The court held that the State proved that the substance seen on the video was cocaine because Hall and his cohort admitted on the video that it was crack cocaine *and corroborating evidence supported that conclusion*. *Id.* at *15. The corroborating evidence included "testimony that [Hall] was a member of . . . a street gang whose primary purpose is to sell narcotics for profit, guilty pleas to possession of cocaine with intent to deliver from four other [gang] members . . ., and other scenes from the videotape which all tend to make [Hall's] admission more likely than not to be true." *Id.*

11

bags in a manner consistent with drug use. *See L.G.*, 728 S.W.2d at 941. No witness testified that appellant told them that the bags contained marihuana. *See Hernandez*, 698 S.W.2d at 679-80; *L.G.*, 728 S.W.2d at 942. The State produced only the videotape, showing bags apparently containing some unidentifiable substance, and appellant's statement, made while he is joking around with Rowlette-Ulloa, about "Mary and Jane." The State was required to prove beyond a reasonable doubt that appellant possessed marihuana on or about December 15, 2000. Although "Mary and Jane" might be a reference to marihuana, Garza's opinion, combined with a statement that might be a slang reference to marihuana, is insufficient to show *beyond a reasonable doubt* that appellant in fact possessed marihuana in December. To allow a conviction based on this evidence could lead to absurd results. We sustain appellant's second point of error.

### Drug-Free Zone Findings

Appellant was convicted of possession and delivery in a "drug-free" zone. A drug-related offense is enhanced[8] if it was committed within 1,000 feet of "premises owned, rented, or leased" by a school, including a day-care center, which is defined as a "child-care facility that provides care for more than 12 children under 14 years of age for less than 24 hours a day." Tex. Health & Safety Code Ann. § 481.134 (West Supp. 2004-05); Tex. Hum. Res. Code Ann. § 42.002(7) (West Supp. 2004-05). The State offered evidence that the Headstart Program, an organization that provides daycare for children between the ages of three and five during the school

---

[8] A drug-related offense may be enhanced, for example, from a state-jail felony to a third-degree felony or from a second-degree to a first-degree felony, and punishment may be increased, for example, the minimum confinement increased by five years and the minimum fine doubled. *See* Tex. Health & Safety Code Ann. § 481.134(b)-(f) (West Supp. 2004-05).

year, operated a facility within 1,000 feet of appellant's house, and the jury returned affirmative findings that appellant had in fact conducted drug-related activities within a drug-free zone.

In his third point of error, appellant argues that the jury's findings of a drug-free zone are not supported by the evidence. He asserts that the evidence does not show that Headstart had a lease for the facility in July 2000 or that his house was within 1,000 feet of Headstart's premises.

Delia Gomez, who works for the Headstart Program, testified that in June and July of 2000, Headstart operated a facility at 2910 IH-35 in New Braunfels that served about twenty children.[9] Gomez described two photographs introduced into evidence as showing the building and playground out of which Headstart operated. A sign on the side of the building reads, "CCSCT Headstart Child Development Center." Mark Mault, investigator for the district attorney's office, testified that he measured the distance from appellant's mailbox to the fence line of the church and the Headstart facility using a rolling measure, and determined that appellant's mailbox was 574 feet from the fence. Mault said that "[r]ight behind the fence is the First Presbyterian Church and Headstart." Mault clarified that immediately behind the fence is a parking lot, which was used by the church and Headstart. Mault "understood" that Headstart leased the facility from the church. Mault also used a digital odometer to measure the distance from appellant's mailbox to Headstart's back door and found it to be one-tenth of a mile.[10]

_____

[9] Although these offenses occurred in July, the statute does not exempt offenses committed during summer vacations, when children may not be present. *See id*. § 481.134. Headstart stopped operating at 2910 IH-35 after the school year ended in May 2003.

[10] Appellant asserts that Mault's testimony showed that he measured from appellant's mailbox to the fence, but the record is not so clear as appellant claims. Mault testified, "With the odometer I started at the mailbox . . . and drove to the back door of Headstart two separate ways." Mault "actually drove on the streets" and found the distance to be "a little bit further." Mault was

13

Appellant argues that there was insufficient testimony that Headstart leased the facility and no evidence of exactly how far it was from his house to Headstart's "leasehold," and therefore, the evidence is legally insufficient to support the drug-free zone findings. We disagree.

Gomez testified that Headstart operated out of the building in question. Mault testified that he believed Headstart leased the facility from the church and used the parking lot immediately behind the fence. Mault testified that appellant's mailbox, which is in front of the house and yard, was located well within 1,000 feet both of the fence and the backdoor of the Headstart facility. Although the State could have been more thorough in the evidence presented, we hold that based on the testimony and photographs of appellant's house and mailbox, the streets in question, and the Headstart facility, the jury could have found beyond a reasonable doubt that appellant committed the offenses within a drug-free zone. *See Young v. State*, 14 S.W.3d 748, 753-54 (Tex. Crim. App. 2000) (officer testified that premises were owned by school and that traffic wheel showed offense took place 335 feet from school; maps were also admitted showing limits of drug-free zone); *Fluellen v. State*, 104 S.W.3d 152, 158-59 (Tex. App.—Texarkana 2003, no pet.) (superintendent testified that stadium was used by school and offense took place within one block of stadium); *White v. State*, 59 S.W.3d 368, 369-371 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (measuring wheel showed offense took place 617 feet from property owned by church, which operated school on same premises). The evidence is legally sufficient to show that appellant's

then asked, "But you couldn't go through the fence. Or could you?" Mault answered, "I could not go directly from one point to another, no, sir."

14

possession and delivery of drugs took place within 1,000 feet of Headstart's facility and that Headstart leased the facility from the church. We overrule appellant's third issue.

## Conclusion

We have overruled appellant's first and third issues on appeal. However, we have sustained his second issue, holding that the evidence is legally insufficient to support his conviction for drug possession on December 15, 2000. Therefore, we render a judgment of acquittal as to count II in trial court cause number CR2003-252 (our cause number 03-04-00048-CR). We affirm the conviction for count I of that cause (possession of marihuana on July 13, 2000) and the convictions in cause numbers CR2002-376, CR2003-250, and CR2003-251.

_____

David Puryear, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed in Part; Reversed and Rendered in Part in Cause No. 03-04-00048-CR
Affirmed as to Cause Nos. 03-04-00017-CR, 03-04-00046-CR & 03-04-00047-CR

Filed: October 7, 2005

Do Not Publish